**In re Stanley R. JOHNSON, Respondent.**

**No. 93–FM–1094.**

District of Columbia Court of Appeals.

Argued April 17, 1996.
Decided Aug. 7, 1997.

Stephen H. Glickman, Gregory H. Gust, and Arthur B. Spitzer, Washington, DC, filed a brief on behalf of the American Civil Liberties Union as amicus curiae.

Richard F. Gondelman, Assistant Corporation Counsel, with whom Charles F.C. Ruff, Corporation Counsel, and Janet L. Maher, Deputy Corporation Counsel, filed a brief on behalf of the Corporation Counsel as amicus curiae.

Before KING, RUIZ and REID, Associate Judges.

RUIZ, Associate Judge:

Stanley Johnson was held in civil contempt of a court order requiring him to submit to a psychiatric examination at the Commission on Mental Health pursuant to a private, non-emergency petition for judicial hospitalization filed under the Ervin Act, D.C.Code § 21–541(a)(2) (1997).[1] On appeal, Mr. Johnson alleges that the Ervin Act is unconstitutional in that it violates his rights to privacy and due process of law, that the petition used to commence the judicial hospitalization proceeding in his case was factually insufficient to meet due process probable cause requirements, and that he was entitled to an evidentiary hearing on his motion to quash the subpoena. Mr. Johnson also contends that the evidence was insufficient to sustain a finding of contempt. Because we find that Mr. Johnson was entitled to an evidentiary hearing on his motion to quash the subpoena, we vacate the order of civil contempt and remand for further proceedings.

Lois R. Goodman, Newark, NJ, for appellant.

Burton Penn, for appellee Mrs. Geneva Johnson.

1. Proceedings for the civil commitment of persons in the District of Columbia are governed by the "District of Columbia Hospitalization of the Mentally Ill Act," D.C.Code §§ 21–501 –592 (1997), also known as the Ervin Act.

2. D.C.Code § 21–541 provides in part that:

 (a) Proceedings for the judicial hospitalization of a person in the District of Columbia may be commenced by the filing of a petition with the Commission on Mental Health by his spouse, parent, or legal guardian.... The petition shall be accompanied by:
 (1) a certificate of a physician or qualified psychologist stating that he has examined the person and is of the opinion that the person is mentally ill, and because of the illness is likely to injure himself or other persons if allowed to remain at liberty; or
 (2) a sworn written statement by the petitioner that:

## I. FACTS

On October 9, 1992, Geneva Johnson filed a petition and supporting affidavit for judicial hospitalization of her son, Stanley Johnson.[2]

Mrs. Johnson was able to commence this proceeding by filling out and signing preprinted petition and affidavit forms that are available at the Clerk's Office of the Superior Court. The preprinted petition contains language designed to satisfy the requirements of § 21–541(a)(2), which provides for the spouse, parent or legal guardian of a person alleged to be mentally ill to commence judicial hospitalization proceedings without certification by a qualified professional.[3] The preprinted affidavit serves as the factual basis for the petitioner's belief that a person is mentally ill and likely to injure him or herself or others. The affidavit provides boxes for a petitioner to check in order to describe the allegedly mentally ill person's condition. In this case, Mrs. Johnson checked the boxes indicating that Mr. Johnson had received psychiatric treatment at D.C. General Hospital,[4] and that Mr. Johnson's speech was loud, rambling and profane.[5] The affidavit form also contains over twenty-five choices to describe the allegedly mentally ill person's general behavior. Mrs. Johnson checked the following eight boxes to describe her son's behavior: alcoholic, used drugs in the past, threatening,[6] unable to get along with family, agitated, hostile, unpredictable, and using drugs at present time.[7] Mrs. Johnson added

> (A) the petitioner has good reason to believe that the person is mentally ill, and, because of the illness, is likely to injure himself or other persons if allowed to remain at liberty; and
> (B) the person has refused to submit to examination by a physician or qualified psychologist.

3. Paragraph three of the petition states that "petitioner has attempted to get the respondent to go to the hospital to see a physician but respondent has refused to submit to an examination by a physician." Paragraph five states that "petitioner has good reasons to believe that the respondent is mentally ill, and because of such illness is likely to injure himself/herself or others if allowed to remain at liberty." The petition form leaves spaces for the petitioner's and respondent's name and address and the petitioner's relationship to the respondent. Mrs. Johnson put the same address for herself and Mr. Johnson and indicated that Mr. Johnson was her son. There is also a space for the respondent's age and a space to indicate whether the respondent is employed. Mrs. Johnson indicated that Mr. Johnson was thirty-nine years old and unemployed. The preprinted petition form requests that the respondent be directed to appear before

a handwritten note following a section of the form which asked for an "Explanation of foregoing behavior and other relevant behavior":

> Stanley is very hard to get along with. He don't [sic] seem to understand when you talk to him that as his parents we are not obligated to take care of his wants and need [sic]. However we realy [sic] try, he gets very loud and nasty when he is asked to leave the house and all ways [sic] demanding money. He has stolen from me many times and he is a terrible liar. He knocks on the door in the morning and late evening. I have often called police. I have all so [sic] asked him to please get help. I have, realy [sic] had my fill. However it is very hard for me to make this decision.

According to a practice that appears to have developed in these types of matters, a Superior Court judge, in this case Judge Block, reviewed the petition *ex parte* and found that "there is reason to believe the respondent is mentally ill and is likely to injure himself or others."[8] On the same day, October 13, 1992, Judge Block appointed counsel to represent Mr. Johnson and ordered that Mr. Johnson be subpoenaed to

the Commission on Mental Health for an examination and hearing, be appointed counsel, be hospitalized at Saint Elizabeths Hospital, be sent a copy of the petition, and any other relief that the court deems proper.

4. The form did not request, and Mrs. Johnson did not provide, dates or other pertinent information regarding the psychiatric treatment.

5. The other boxes, not checked by Mrs. Johnson, would have characterized Mr. Johnson's speech as incoherent, normal or mute.

6. Mrs. Johnson did not explain her reason for checking "threatening" as the form requested.

7. Among the boxes that Mrs. Johnson did not check were those that characterized behavior as "Depressed," "Delusional," "Assaultive," "Made previous attempts to take own life," "Laughs or talks to self," and "Sees things that are not there."

8. All parties agree that the practice of sending a petition and affidavit to a Superior Court judge is not found in the Ervin Act or in any of the applicable rules.

appear before the Commission on Mental Health for a psychiatric examination and hearing.[9] On October 30, 1992, Mr. Johnson filed a motion to quash the subpoena alleging that there had not been a judicial finding of probable cause that he was mentally ill and a danger to himself or others, and that Mrs. Johnson's allegations in the initial petition and affidavit were insufficient as a matter of law to establish probable cause. The examination that had been scheduled for November 5th was stayed pending resolution of the motion.

Hearings on the motion to quash were held on November 18th and 25th before Judge Moore. On December 1, 1992, Judge Moore denied Mr. Johnson's motion to quash finding that "a subpoena signed by a Judge ordering Respondent to appear for an examination before the Commission of Mental Health without first holding an adversarial probable cause hearing is a minimal intrusion on Respondent's right to privacy and therefore is neither statutorily nor constitutionally impermissible." Another subpoena was issued for Mr. Johnson's attendance at a rescheduled examination date, December 17, 1992. Mr. Johnson appeared at the examination, but refused to answer questions. On March 23, 1993, Judge Wertheim granted the Commission's motion to compel Mr. Johnson to submit to the examination and answer all questions, subject to any Fifth Amendment rights. Mr. Johnson attended the resched-

uled examination on May 11th, but again refused to answer any questions. The Commission recommended to the trial court that Mr. Johnson be held in civil contempt; Mrs. Johnson requested similar relief. On August 20, 1993, Judge Alprin found Mr. Johnson in civil contempt for his failure to obey the March 23rd order compelling him to submit to a psychiatric examination. Judge Alprin, stating that "the issue should be resolved by the Court of Appeals," stayed Mr. Johnson's incarceration pending this appeal.

Had Mr. Johnson not appealed, the next step in the judicial hospitalization process, as specified by D.C.Code § 21–542, would require that "[t]he Commission *shall promptly examine a person alleged to be mentally ill after the filing of a petition* under section 21–541 and shall thereafter promptly hold a hearing on the issue of his mental illness." [10] (Emphasis added.) At issue in this appeal is what procedural safeguards, if any, apply once a private, non-emergency petition for judicial hospitalization under D.C.Code § 21–541(a)(2) has been filed, but before the Commission may compel the psychiatric examination of the person alleged to be mentally ill.

## II. Mooteness

We first must consider certain post-appeal submissions made by Mrs. Johnson which raise an issue of potential mootness.[11] *See Richards v. D.C. Hackers' Li-*

9. The Commission on Mental Health is a nine-member group of experts composed of one lawyer and eight physicians with experience in the diagnosis and treatment of mental illness, appointed by the Superior Court, for the purpose of advising the court in connection with proceedings involving issues of mental illness. D.C.Code § 21–502; *Lake v. Cameron,* 364 F.2d 657, 662 (D.C.Cir.1966).

10. After the Commission conducts an examination and holds a hearing pursuant to § 21–542 on the question of the respondent's mental illness, the Commission must make a finding whether the person "is mentally ill, and, because of the illness, is likely to injure himself or other persons." If so, then the Commission must report this finding in writing to the Superior Court. D.C.Code § 21–544. Upon receipt of the Commission's findings, the trial court sets the matter for a hearing. The person alleged to be mentally ill may demand a jury trial, but if no demand is made, "the court shall determine the person's

mental condition on the basis of the report of the Commission, or on such further evidence in addition to the report as the court requires." D.C.Code § 21–545. If the court or jury finds that the person is "mentally ill, and, because of that illness, is likely to injure himself or other persons" the court may order hospitalization for an indeterminate period. *Id.* Section 21–545 also provides that "[t]he Commission, or a member thereof, shall be competent and compellable witnesses at a hearing or jury trial."

11. After Mr. Johnson had filed the docketing statement, record and brief on appeal and after the ACLU filed a request to appear as *amicus* and lodged its brief in the instant appeal, Mrs. Johnson on November 7, 1994, filed a Motion to Withdraw Petition and Dismiss Appeal, which Mr. Johnson opposed at length. In her motion, Mrs. Johnson informed the court that she had obtained a civil protection order against her son pursuant to which he must "stay away" from her and her residence on penalty of incarceration for

*cense,* 357 A.2d 439, 441 (D.C.1976). Based on the history of the proceedings in this case, we conclude that Mr. Johnson's appeal challenges an ongoing threat to his asserted constitutionally-protected rights. Further, even if the current petition that gave rise to the order compelling him to submit to a psychiatric examination were to be withdrawn, he would continue to be at risk of being once again ordered to submit to a psychiatric examination without the opportunity for appellate review and guidance on the legality of the subpoena procedures currently in effect. Finally, the truncated proceeding in the trial court may have a continuing adverse impact on Mr. Johnson.

■ A matter is generally deemed moot and nonjusticiable if " 'there is no reasonable expectation . . .' that the alleged violation will recur and . . . events have completely and irrevocably eradicated the effects of the violation." *In re Morris,* 482 A.2d 369, 371 (D.C.1984) (quoting *County of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979)). Here, the continued viability of the appeal is apparent. First, even assuming that Mrs. Johnson were to withdraw her petition—a contingency about which there is serious doubt [12]—the District

of Columbia may well continue to press the matter. We note that the Commission requested that Mr. Johnson be held in contempt for failure to submit to the psychiatric examination. The Corporation Counsel has not indicated that, in the absence of Mrs. Johnson's petition, it would not pursue judicial hospitalization of Mr. Johnson.

Second, even if Mrs. Johnson were to withdraw her petition and the District of Columbia did not proceed, Mr. Johnson has made out a good claim that this is the type of situation that is capable of repetition yet evading review. *Id.* at 372; *In re DeLoatch,* 532 A.2d 1343, 1344 (D.C.1987). Mrs. Johnson has made clear in her prior motion to this court that she considers she has a "right" to file a new petition for judicial hospitalization "if the need arises." If she does—and nothing would preclude her from doing so—Mr. Johnson will be in the same position of being compelled to submit to a psychiatric examination as when his mother first filed a petition in 1992 and which he, through his counsel, has been trying to get clarified ever since.[13] *Cf. Hardesty v. Draper,* 687 A.2d 1368, 1371 (D.C.1997) (appeal of daughter committed to a mental hospital by

a willful violation of that order. As Mrs. Johnson makes clear, the order is enforceable by contempt. That motion was denied for lack of jurisdiction on May 10, 1995, because this court is not the proper forum in which to withdraw the petition; the mootness issue was not addressed. Mrs. Johnson then filed a Motion to Remand Case to the Superior Court for Petitioner to Withdraw Petition and Move to Dismiss Case and a Stay of the Briefing Schedule, which her son again opposed. That motion also was denied, without opinion, on July 25, 1995. By that time, the District of Columbia, through the Office of Corporation Counsel, had filed a motion to intervene, which we construed and granted as a motion to appear as *amicus.* Mrs. Johnson did not file a brief in this appeal, but instead filed a statement indicating that "[i]t was never [her] purpose to have her son jailed or incarcerated. It was her purpose to have him receive medical psychiatric help for his mental illness."

**12.** In her post-appeal submissions, Mrs. Johnson has not said that she would withdraw the petition on the merits; to the contrary, she continues to assert that she believes that her son should be committed and that she will refile a petition if necessary. Even as to her offer to withdraw the current petition, she has said only that she would

withdraw it in order to avoid her son's incarceration. It is highly unlikely, however, that Mr. Johnson will ever be incarcerated as a result of Mrs. Johnson's petition. In the trial court as well as before this court, Mr. Johnson's counsel has represented that the only reason why Mr. Johnson placed himself in contempt is so that he could obtain an appealable order. Based on that representation, we assume that if we were to rule against Mr. Johnson on the merits, he would submit to the psychiatric examination. Thus there would be no threat of incarceration, and no withdrawal of his mother's petition.

**13.** As an illustration of what could happen, in Mr. Johnson's Response to Mrs. Johnson's Motion to Dismiss, we are informed of at least two other cases in which Mr. Johnson's counsel, Lois Goodman, represented the respondents and the ACLU and PDS were involved as *amici,* where this court dismissed the appeals as moot because petitioning parents withdrew the petition for an involuntary civil commitment after their children filed appeals. In one, *Jacqueline Isley v. Honorable Samuel Block,* No. 97–CV–503, the mother did, in fact, file a subsequent petition. In neither of those dismissal orders did this court address the question whether the issue on appeal was "capable of repetition yet evading review."

her mother under statutory provision permitting parental hospitalization of minors became moot once the daughter attained the age of majority because "there is no danger that her parents will 'voluntarily' commit her").

Third, Mr. Johnson could continue to suffer adverse effects from the truncated proceedings to date because, even if the petition were withdrawn, there would be a record of a judicial finding that "there is reason to believe" that Mr. Johnson is mentally ill and likely to injure himself or others. Part of Mr. Johnson's claim on appeal is that this *ex parte* finding violated his constitutional rights. Without an appeal, the validity of the trial judge's *ex parte* finding will remain untested, possibly with adverse repercussions for Mr. Johnson, without any adjudication as to its legality. *Id.; Friend v. United States*, 128 U.S.App. D.C. 323, 325, 388 F.2d 579, 581 (1967) (case challenging revocation of conditional release from mental hospital not moot even after conditional release had been reinstated because of possible adverse effect that challenged revocation order may have on employment opportunities and there was likelihood that conditional release could be revoked again).

The Commission's legal position means that in the event Mrs. Johnson were to file a new petition for judicial hospitalization, the Commission would not review Mrs. Johnson's petition before it can (indeed, must) order Mr. Johnson to submit to a psychiatric examination, and that such order would be exempt *from judicial scrutiny pursuant to a motion to quash.* Therefore, as matters now stand, by refiling a petition, Mrs. Johnson can have her son involuntarily subjected to a psychiatric examination without there first being appellate assessment of the legality of the subpoena and compulsion procedures being utilized pursuant to a private, non-emergency petition for judicial hospitalization. Mr. Johnson has undertaken over a four-year period to obtain review of his rights in the face of attempts to compel him to submit to a psychiatric examination. The history of this case amply demonstrates that the most concerted efforts to obtain appellate review of a pending order to compel can prove unavailing.[14] Under these circumstances, not only is the matter not moot and appropriate for judicial consideration, but it would be unfair to deny Mr. Johnson access to appellate review. Thus, we now turn to the merits of Mr. Johnson's appeal.[15]

### III.

### Due Process Consideration of Compelled Psychiatric Examination

■ Mr. Johnson contends on appeal, as he did in the trial court, that he is entitled to a evidentiary hearing on his motion to quash the subpoena ordering him to submit to a

---

14. Prior to this appeal from the order holding him in contempt, Mr. Johnson had filed two appeals, one from the denial of his motion to quash the subpoena for a psychiatric examination and one from the order compelling him to submit to the examination. Both were denied for lack of jurisdiction as having been taken from non-final orders. Mr. Johnson had also requested the trial court to certify the issue to this court, as "involv[ing] a controlling question of law as to which there is substantial ground for a difference of opinion," pursuant to D.C.Code § 11–721(d). That request also was denied. All were an attempt to obtain appellate review of the question whether the Commission can subject Mr. Johnson to a psychiatric examination against his will based on an *ex parte* unexamined petition filed by his mother.

15. In his dissent, Judge King argues that the controversy between Mr. Johnson and his mother has been resolved, and is therefore moot, because the civil protection "stay away" order Mrs. Johnson obtained subsequent to her petition for judicial hospitalization has provided her with a *more effective way of having her son "stop bothering her."* Apart from what this observation says about the potential for abuse of private, non-emergency petitions for judicial hospitalization under § 21–541(a)(2), we cannot disregard Mrs. Johnson's statement, filed in lieu of a brief on appeal, that her intention was to obtain "medical *psychiatric help for* [Mr. Johnson's] mental illness." To the extent that the sincerity of Mrs. Johnson petition is an issue, inquiry into that subject properly could have been made, consistent with our disposition on the merits of this appeal, at a hearing on Mr. Johnson's motion to quash the subpoena ordering him to appear for a *psychiatric examination.*

psychiatric examination before the Commission of Mental Health. As noted earlier, Judge Moore held two hearings, on November 18 and 25, 1992, on Mr. Johnson's motion to quash the subpoena. The discussions at both hearings focussed on whether the trial court was required to hold an evidentiary hearing on the motion to quash to determine whether there was probable cause to support the petition for judicial hospitalization, but no evidentiary hearing was actually held.[16] Mr. Johnson contends that such hearing is necessary so that he can cross-examine the petitioner about the allegations in her petition.[17] The ACLU agrees with Mr. Johnson that due process and the Ervin Act require a *de novo* evidentiary hearing prior to compelling Mr. Johnson to submit to a psychiatric examination, and argues that, at a minimum, the issuance of a subpoena under the Ervin Act should be treated like any subpoena issued under Superior Court Civil Rule 45 and D.C.Code § 11–942 (1995). The ACLU argues, in addition, that the Commission has an obligation to screen petitions for probable cause before requesting that the court issue subpoenas for psychiatric examination.[18]

Counsel for Mrs. Johnson argued in the trial court that the petition itself supplied sufficient probable cause to justify the subpoena,[19] that a hearing was neither statutorily nor constitutionally required and that a speedy examination was in the public interest and in Mr. Johnson's best interest. On appeal, the Corporation Counsel further argues that the Commission has an obligation to "promptly examine" the subject of the petition under § 21–542, so that it may report its findings to the court, as required by § 21–544.

In ruling on the motion to quash, Judge Moore found that "ordering [Mr. Johnson] to appear for an examination before the Commission of Mental Health without first holding an adversarial probable cause hearing is a *minimal intrusion* on [his] right to privacy and therefore is neither statutorily nor constitutionally impermissible." (Emphasis added.) Mr. Johnson contests this finding, arguing that he has a constitutionally-protected right to privacy that can be overcome only by a compelling state interest. The ACLU adds that there are also constitutional liberty and due process interests at stake.

The District of Columbia, on the other hand, supports the trial court's conclusion that any intrusion into constitutionally-protected interests is minimal and outweighed by the compelling public interest in a prompt

**16.** A petition to initiate judicial hospitalization must be accompanied by a sworn statement by the petitioner that "the petitioner has *good reason to believe* that the person is mentally ill." D.C.Code § 21–541(a)(2) (emphasis added). Judge Block, in reviewing the petition and affidavit, found that "there is *reason to believe* the respondent is mentally ill." (Emphasis added.) Mr. Johnson contends that before he is compelled to submit to a psychiatric examination it must be established by probable cause that he is mentally ill and, as a consequence, dangerous. The language "good reason to believe" and "reason to believe," therefore must be interpreted to mean probable cause. The ACLU, as *amicus*, also argues that probable cause is needed and urges this court to clarify the requirement of "good reason to believe." At the hearings held on the motion to quash the subpoena, Mrs. Johnson's position was that the petition and affidavit established probable cause. Corporation Counsel's argument on appeal is that the phrase "good reason to believe" in § 21–541 is equivalent to probable cause. As none of the parties disputes that the statutory language "good reason to believe" is the equivalent of probable

cause, we so assume without deciding for purposes of this case.

**17.** Mr. Johnson contends that the ability to inquire into Mrs. Johnson's allegations would provide a necessary opportunity for him to "pierce the perjury, bias, bad motivation, misunderstanding or lack of ability to judge mental illness of the affiant."

**18.** Mr. Johnson, in his reply brief, agrees that there must be a preliminary probable cause determination on the petition, but states that either the court or the Commission could perform that function *ex parte*.

**19.** During the arguments at the May 18, 1992, hearing following the motion to quash, Mrs. Johnson's counsel suggested that if the trial court did not think that the petition itself established sufficient probable cause for the subpoena, the trial court could place Mrs. Johnson under oath for *ex parte* questioning by the trial court. As discussed above, the trial court did not independently inquire into the basis for the petition because it considered itself to be bound by the prior *ex parte* "reason to believe" determination.

resolution of a § 21–541 petition.[20] The Corporation Counsel would apply to a compelled psychiatric examination pursuant to a § 21–541 petition for judicial hospitalization the same analysis which the Court has undertaken in holding that the Fourth Amendment does not require the full panoply of adversarial safeguards before an arrested individual can be detained pending trial. *Gerstein v. Pugh,* 420 U.S. 103, 120, 95 S.Ct. 854, 866, 43 L.Ed.2d 54 (1975). Just as the Fourth Amendment permits that a person be seized and deprived of liberty based only upon an *ex parte* probable cause determination in a criminal case, the Corporation Counsel argues, it also is reasonable to compel a person to submit to a psychiatric examination based on an *ex parte* probable cause determination.[21]

 Constitutionally-protected rights to privacy and liberty under the Fourth[22] and Fifth[23] Amendment to the Constitution may be implicated when an individual is compelled to submit to a psychiatric examination. *In re Kossow,* 393 A.2d 97, 103–4 (D.C.1978). In construing a statutory scheme such as the Ervin Act, we do so in a manner that furthers the legislature's objectives. *See Capi-*

*tol Hill Hosp. v. District of Columbia State Health Planning and Dev. Agency,* 600 A.2d 793, 802 (D.C.1991). Where a constitutional challenge to a statute is made, and the statutory language permits, we construe a statute so as to avoid a constitutional confrontation. *See Owens–Corning Fiberglas Corp. v. Henkel,* 689 A.2d 1224, 1234 (D.C.1997). The Ervin Act "evolved out of a 'profound congressional concern for the liberties of the mentally ill' and was designed with the view to securing at last the civil and constitutional rights of that long-neglected group." *In re Lomax,* 386 A.2d 1185, 1188 (D.C.1978) (en banc) (citations omitted). In light of the express legislative concern for the constitutional rights of the mentally ill and the potential abridgment of those rights implicated by a compelled psychiatric examination, the question becomes one of how much process is due before an individual can be so compelled pursuant to a private, non-emergency petition for judicial hospitalization under D.C.Code § 21–541(a)(2). This issue is one of first impression.

We begin, as always, with the statutory language. Section 21–541, under which Mrs. Johnson's petition was filed, initiates the

---

**20.** In *Addington v. Texas,* 441 U.S. 418, 426, 99 S.Ct. 1804, 1809, 60 L.Ed.2d 323 (1979), a civil commitment case, the Court stated:

[t]he state has a legitimate interest under its *parens patriae* powers in providing care to its citizens who are unable because of emotional disorders to care for themselves; the state also has authority under its police power to protect the community from the dangerous tendencies of some who are mentally ill.

**21.** Corporation Counsel further argues that searches with no warrant or probable cause have been allowed in cases involving privacy interests greater than the interest asserted by Mr. Johnson, citing *Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 613–14, 109 S.Ct. 1402, 1410–12, 103 L.Ed.2d 639 (1989) (testing of railroad employees' urine, blood and breath to detect drug or alcohol abuse) and *National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989) (same, for certain customs agents). We find these cases are inapposite given the heightened public safety interests involved in the case of criminal arrests based on probable cause and in the performance of public employees. We consider that the proper analogy to such cases would be to the Ervin Act's emergency hospitalization procedures, discussed *infra.*

**22.** The Fourth Amendment of the Constitution protects "the right of the people to be secure in their persons ... against unreasonable searches and seizures." U.S. Const. amend. IV. The Court has "recognized that the principal object of the Fourth Amendment is the protection of privacy...." *Warden v. Hayden,* 387 U.S. 294, 304, 87 S.Ct. 1642, 1648, 18 L.Ed.2d 782 (1967).

**23.** The Fifth Amendment to the Constitution guards against deprivations of "liberty ... without due process of law." U.S. Const. amend. V. The right to privacy has been held to be an aspect of the constitutional right to liberty. *See Roe v. Wade,* 410 U.S. 113, 152–53, 93 S.Ct. 705, 726–27, 35 L.Ed.2d 147 (1973); *Griswold v. Connecticut,* 381 U.S. 479, 484, 85 S.Ct. 1678, 1681, 14 L.Ed.2d 510 (1965). In *United States v. Benn,* the Court of Appeals noted that any rigid rule requiring the psychiatric examination of a mentally retarded sex offense complainant would be precluded by countervailing considerations such as the concern that "a psychiatric examination may seriously impinge on a witness' right to privacy...." 155 U.S.App. D.C. 180, 184, 476 F.2d 1127, 1131 (1972).

process for judicial hospitalization.[24] The Commission generally is charged with "examin[ing] alleged mentally ill persons, inquir[ing] into their affairs and the affairs of persons who may be legally liable for their support, and mak[ing] reports and recommendations to the court." D.C.Code § 21–503(a). More specific to this case, the statute provides that once a petition for judicial hospitalization has been filed, "[t]he Commission *shall promptly examine* a person alleged to be mentally ill ... and shall thereafter promptly hold a hearing on the issue of his mental illness." D.C.Code § 21–542(a) (emphasis added). Section 21–503(b) provides generally that the court may issue subpoenas at the request of the Commission.[25]

It is clear from the language of the statute that the Commission's ability to examine a person alleged to be mentally ill is essential in the court's consideration of a request for judicial hospitalization. It is also clear that a person alleged to be mentally ill may be compelled to appear for examination, pursuant to a court-issued subpoena. What the statutory language does not address, however, is what process is to be followed in the issuance and enforcement of subpoenas for psychiatric examination.

Turning to the procedures used in this case, we note that although the Ervin Act provides that subpoenas are to issue "at the request of the Commission," D.C.Code § 21–503(b), it appears that the preprinted request for a subpoena contained in Mrs. Johnson's petition was automatically forwarded to the trial court, without prior review or action by the Commission. In this case, the subpoena issued upon the filing of Mrs. Johnson's petition and Judge Block's *ex parte* finding that there was "reason to believe" that Mr. Johnson was mentally ill and likely to injure himself or others.

The Commission's screening and compromising role in the judicial hospitalization process has been likened to that of the prosecutor in criminal matters. "When a private party files a petition for involuntary hospitalization of another, that petition is first considered by the Commission, 'which was established in recognition of the fact that the assistance of unbiased experts was essential to assist the courts in dealing with insanity cases.'" *Kossow, supra,* 393 A.2d at 106 (quoting *Lake v. Cameron,* 124 U.S.App. D.C. 264, 269, 364 F.2d 657, 662 (1966) (en banc) (internal quotation marks omitted)). The Commission has the expertise to test the sufficiency of the petition filed, and the opportunity to inquire further from the petitioner and obtain additional information, if necessary, at the time of filing. We confirm that the Ervin Act requires that the Commission must first perform that screening function before a subpoena may issue "at the request of the Commission," D.C.Code § 21–503(b), so that it can then examine the person alleged to be mentally ill and hold a hearing as required by the statute. *Id.* As this case makes evident, the Commission's screening function is a necessary aid in the court's consideration of motions to quash subpoenas for mental examinations. From a due process standpoint, it would add significantly to the procedural safeguards afforded to a person who is the subject of a petition for judicial hospitalization.

Comparing the procedures in this case with those involved in the usual civil subpoena, we note, first, that the events triggering issuance of the subpoena in this case were somewhat more substantive than those that initiate the routine civil subpoena, but only minimally so. Civil subpoenas are usually issued as a matter of course upon request.[26]

---

**24.** See note 2, *supra.*

**25.** Section § 21–503(b) provides:
Except as otherwise provided by this chapter, the Commission may conduct its examinations and hearings either at the courthouse or elsewhere at its discretion. The court may issue subpoenas at the request of the Commission returnable before the Commission, for the appearance of the alleged mentally ill person, witnesses, and persons who may be liable for

his support. The Commission, or any of the members thereof, are competent and compellable witnesses at any trial, hearing or other proceeding conducted pursuant to this chapter and the physician- or psychologist-patient privilege is not applicable.

**26.** "The clerk shall issue a subpoena, signed but otherwise in blank, to a party requesting it, who shall complete it before service. An attorney as

*See Davis v. Winfield,* 664 A.2d 836, 838–39 (D.C.1995). The preprinted forms used to request the subpoena in this case, with their untested allegations of mental illness made by a lay person, without any professional assessment, provided a scant record upon which the trial judge could conclude *ex parte* there was "reason to believe" Mr. Johnson was mentally ill and likely to injure himself or others. Unlike in the routine civil subpoena where a trial court intervenes to determine the validity of a subpoena when the party subpoenaed files a motion to quash,[27] the *ex parte* finding in this case was not reviewed by any judicial officer, even after Mr. Johnson challenged it, before he was ordered to submit to a psychiatric examination. Mr. Johnson did not have the opportunity to challenge the psychiatric examination as calling for "protected" matter or imposing an "undue burden" that he would have had if he had been served with a routine civil subpoena requesting his testimony or documents.

In considering whether the procedure followed in this case comports with applicable due process requirements, "we must ask what is fundamentally fair under the circumstances, taking into account 'the interests at stake and the corresponding rights ... of the respective parties.'" *Kossow, supra,* 393 A.2d at 104 (quoting *In re Ballay,* 157 U.S.App. D.C. 59, 64, 482 F.2d 648, 653 (1973)). This court in *Kossow* adopted a balancing of interests analysis in its discussion of Fifth Amendment due process requirements. 393 A.2d at 97. We adopt a similar approach in this case.[28]

There is no doubt that the government has an interest, indeed a statutory obligation, to promptly examine a person who is alleged to be mentally ill and likely to injure him or herself or others. Section 21–542 of the Ervin Act is an expression of that governmental interest. The government's interest in the prompt examination of an allegedly mentally ill person pursuant to a private, non-emergency petition for judicial hospitalization under of § 21–541(a)(2), however, is by definition of a lesser order than its interest in hospitalizing a person for observation and diagnosis in the exigent circumstances contemplated under the emergency hospitalization provision of § 21–521.[29] *See Kossow, supra,* 393 A.2d at 105 (identifying protection of society as the primary objective of the Ervin Act).

---

officer of the court may also issue and sign a subpoena." Super. Ct. Civ. R. 45(a)(3).

**27.** A trial court is required to quash or modify a subpoena if the subpoena "requires disclosure of privileged or other protected matter and no exception or waiver applies," or if it "subjects a person to undue burden." Super. Ct. Civ. R. 45(c)(3)(A)(iii) & (iv). In considering a motion to quash, the trial court usually holds a hearing on the motion and, as necessary, entertains any relevant testimony. *See Wheeler v. Goulart,* 593 A.2d 173, 178 (D.C.1991) (trial court held a hearing on a motion to quash and heard testimony from several witnesses); *Payne v. United States,* 516 A.2d 484, 496 (D.C.1986) (same); *but see Brooks v. United States,* 448 A.2d 253, 261 (D.C.1982) (finding no obligation for the trial court to hold an evidentiary hearing on a motion to quash a subpoena based on abuse of the grand jury process).

**28.** We note that the District of Columbia Circuit adopted a similar approach, applying traditional Fourth Amendment analysis, when it considered a hospitalization pursuant to the Ervin Act's emergency hospitalization provisions, D.C.Codes § 21–521 to –28. *In re Barnard,* 147 U.S.App. D.C. 302, 455 F.2d 1370 (1971). The

*Barnard* court evaluated the "reasonableness" of the seizure by balancing the level of governmental intrusion into protected rights against the government's interest. The court augmented the procedural safeguards provided for in the Ervin Act as the level of governmental intrusion into protected rights increased.

**29.** A person may be hospitalized under the emergency provision of the Ervin Act upon application by certain officers of the District of Columbia, a physician or qualified psychologist who has reason to believe that the person is mentally ill and likely to injure him or herself or others "if [the person] is not immediately detained." D.C.Code § 21–521. The administrator of the hospital must file a further petition with the Superior Court before the allegedly mentally ill person can be detained in the hospital in excess of forty-eight hours. D.C.Code § 21–523. Within twenty-four hours of receiving the hospital's petition, the court must order either that the person be released or, based on reports and certificates of qualified experts, order continued hospitalization, not to exceed seven days. If continued hospitalization is ordered, the statute provides that the trial court must hold a hearing within twenty-four hours of receiving a request for a hearing from the detained person. D.C.Code § 21–525.

■ The governmental interest must be balanced with the privacy and liberty interests of the person who may be compelled to submit to a psychiatric examination. Although a compelled psychiatric examination of relatively short duration [30] is less intrusive than a compelled emergency hospitalization, we recognize that an intrusion of this type, particularly into the rights of a person who is at liberty, is nonetheless significant.[31] It would be unreasonable to conclude, therefore, that in a situation where the government has a lesser interest, it may intrude upon constitutionally-protected rights with virtually no procedural safeguards, when significant safeguards are required where the government has a greater interest, such as in an emergency hospitalization. Some procedural safeguards are required before a psychiatric examination may be compelled, consistent with the government's legitimate interest in an expeditious examination of the person alleged to be mentally ill.[32]

■ In light of the constitutional interests at stake and the assertion of those interests in a challenge to a subpoena ordering a psychiatric examination, we conclude that in the context of a private, non-emergency petition for judicial hospitalization, there must be an opportunity to challenge subpoenas issued pursuant to D.C.Code § 21–503. The trial court has discretion to determine the scope of the hearing, including whether further evidence is required, consistent with constitutional considerations of privacy and liberty and the statutory mandate that the Commission undertake a prompt examination. Given the nature of Mr. Johnson's challenge to the subpoena in this case and the fact that there was no prior Commission screening of Mrs. Johnson's petition, he was entitled to an evidentiary hearing regarding the sufficiency of the petition and affidavit submitted in support of his hospitalization. Based on the hearing, the trial court should determine whether the petition is supported by probable cause; [33] if so, the subpoena should stand. Otherwise, it must be quashed.

Because Mr. Johnson was held in contempt for failing to comply with a subpoena that did not satisfy necessary procedural safeguards, the judgment of contempt is vacated and the case is remanded for a hearing on Mr. Johnson's motion to quash the subpoena.[34]

*So ordered.*

KING, Associate Judge, dissenting:

It is important to understand that this case arose as a result of long-standing disagreements between a mother and her adult son who was then living with her. On October 9, 1992, as a means of dealing with the problems associated with this relationship, the mother filed a petition for judicial hospitalization of the son pursuant to D.C.Code § 21–541 (1997 Repl.). In seeking this relief the mother was attempting, in essence, to find a way to have her son stop bothering her. Her frustrations are painfully expressed in her statement accompanying the petition, which is quoted in full by Judge Ruiz on page four of the majority opinion.

The filing of the petition has been followed by nearly five years of legal wrangling resulting in the majority opinion holding that the son is entitled to an evidentiary hearing on the question whether the petition is supported by probable cause. Any resolution in favor of the mother in this proceeding, if she is entitled to receive it, is necessarily going

---

30. The Corporation Counsel represents that the compelled examination would last 10–20 minutes.

31. Even a short detention, if compelled, is a seizure; the length of compelled detention goes to its reasonableness. *See United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) ("[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.").

32. We note that if the government considered that Mr. Johnson's condition presented an emergency situation, he could be hospitalized pursuant to § 21–521, whereupon he would be entitled to the Ervin Act's procedural safeguards, as augmented by the court in *Barnard.*

33. See note 16, *supra.*

34. In view of our holding, we do not address the question whether the evidence was insufficient to support a finding of contempt.

to come some time in the future. However, the mother is no longer interested in pursuing the petition because while this matter was pending she found another way to achieve what she has always sought, *i.e.*, the means to keep her son away from her. On May 10, 1994, as she later explained in her remand motion, the mother obtained a civil protection order ("CPO") pursuant to D.C.Code § 16–1001 (1997 Repl.) to "protect herself and her residence from [her son]." On May 31, 1995, expressing her satisfaction with the relief accorded by the CPO, the mother moved to remand this case to the trial court to permit her to withdraw the petition for judicial hospitalization. She repeated that request in a statement in lieu of a brief filed on the same date.

Although a motions panel of this court denied the remand motion, we are free to decide that issue anew. *Kleinbart v. United States,* 604 A.2d 861 (D.C.1992). In my view we should now grant the mother's request and remand the case to the trial court to allow her to withdraw the petition. Because, as the mother has undoubtedly discovered, the CPO process is less cumbersome than the judicial hospitalization procedure, and because the mother is satisfied with the protection accorded by the CPO, withdrawal of the petition is virtually certain to end the matter. We must keep in mind that we are dealing with people with everyday problems and it is their interests that are at stake here. We should give consideration to those interests instead of reaching out to decide a major constitutional issue because the son's attorney and *amicus* want us to decide that issue. *See ante* at 366 n. 13.